A&M RECORDS, INC., a corporation; Geffen Records, Inc., a corporation; Interscope Records; Sony Music Entertainment, Inc.; MCA Records, Inc.; Atlantic Recording Corp.; Island Records, Inc.; Motown Record Co.; Capitol Records, Inc., Plaintiffs–Appellees,

v.

NAPSTER, INC., Defendant–Appellant.

Jerry Leiber, individually and doing business as, Jerry Leiber Music; Mike Stoller and Frank Music Corp., on behalf of themselves and all others similarly situated, Plaintiffs–Appellees,

v.

Napster, Inc., Defendant–Appellant.

Nos. 00–16401, 00–16403.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 2, 2000

Filed Feb. 12, 2001

As Amended April 3, 2001.

Russell J. Frackman (argued), George M. Borkowski, Jeffrey D. Goldman, Roy L. Shults, Peter B. Gelblum, Mitchell Silberberg & Knupp LLP, Los Angeles, CA, Leon P. Gold, Hank Goldsmith, Lawrence I. Weinstein, Frank P. Scibilia, Proskauer Rose LLP, New York, New York, Steven B. Fabrizio, Recording Industry Ass'n of America, Inc., Washington, DC, for A & M Records, Inc. Plaintiffs–Appellees.

Carey R. Ramos (argued), Aidan Synnott, Michael C. Keats, Lewis E. Farberman, Paul Weiss Rifkind Wharton & Garrison, New York, New York, Jeffrey G. Knowles, Keith Evans-Orville, Julia D. Greer, Coblentz, Patch, Duffy & Bass LLP, San Francisco, California, for Leiber plaintiffs-appellees.

Hannah Bentley, San Anselmo, California, for amicus Casanova Records.

Andrew P. Bridges, Wilson, Sonsini, Goodrich & Rosati, Palo Alto, California, for amicus Digital Media Association.

Bruce G. Joseph, Thomas W. Kirby, and Scott E. Bain, Wiley, Rein & Fielding, Washington, D.C., for amici Ad Hoc Copyright Coalition; Commercial Internet Exchange; Computer & Communications Industry Association; Information Technology Association of America; Netcoalition.com; United States Internet Industry Association, and United States Telecommunications Association.

Scott R. McIntosh, Civil Division, Department of Justice, Washington, D.C., for amicus United States.

Ann Brick, San Francisco, California, for amici American Civil Liberties Union and the American Civil Liberties Union of Northern California.

Judith B. Jennison, Perkins Coie, San Francisco, California, for amicus Scour, Inc.

Ralph Oman, Dechert, Price & Rhoads, Washington, D.C., as amicus.

Christopher Tayback, Quinn, Emanuel, Urquhart, Oliver & Hedges, Los Angeles, California, for amicus National Academy of Recording Arts & Sciences.

David Boies, Jonathan Schiller and Robert Silver, Boies, Schiller & Flexner, Armonk, New York, Laurence F. Pulgram, David L. Hayes, Daniel Johnson, Jr. and Darryl M. Woo, Fenwick & West, Palo Alto, California, for defendant-appellant.

E. Edward Bruce, Covington & Burling, Washington, D.C., for amicus Business Software Alliance.

Kevin T. Baine, Williams & Connolly, Washington, D.C., for amici Motion Picture Association of America, Inc., Software & Information Industry Association, American Film Marketing Association, Association of American Publishers, American Society of Media Photographers, Professional Photographers Association, Graphic Artists Guild, Interactive Digital Software Association, American Society of Composers, Authors and Publishers, Broadcast Music, Inc., Producers Guild of America, Directors Guild of America, Inc., Writers Guild of America, West, Inc., American Federation of Musicians of the United States and Canada, Reed Elsevier, Inc., American Federation of Television and Radio Artists, Office of the Commissioner of Baseball, Songwriters Guild of America, and AmSong, Inc.; Joel M. Litvin, New York, New York, for amicus National Basketball Association.

Salvatore A. Romano, Seyfarth, Shaw, Washington, D.C., for amici National Association of Recording Merchandisers, Inc. and Video Software Dealers Association.

Erwin Chemerinsky, University of Southern California School of Law, Los Angeles, California, for amicus Law Professors Erwin Chemerinsky, Kenneth L. Karst, Steven Shiffrin, Rodney A. Smolla and Marcy Strauss.

Barry I. Slotnick, Richards & O'Neil, New York, New York, for amicus Association for Independent Music.

Morton David Goldberg, Cowan, Liebowitz & Latman, New York, New York, for amici Alliance Entertainment Corp., Audible Inc., Blue Spike, Inc., The Clandestine Group, Inc., Digimarc Corporation, Digital Media on Demand, Inc., FullAudio Corporation, InterTrust Technologies Corporation, Oak Technology, Inc., Reciprocal, Inc., RioPort, Inc., RPK SecureMedia Inc., Verance Corporation, and VNU USA, Inc.

Richie T. Thomas, Squire, Sanders & Dempsey, Washington, D.C., for amici Consumer Electronics Association, Digital Future Coalition, and Computer & Communications Industry Association.

Karen B. Tripp, Houston, Texas, for amici Association of American Physicians & Surgeons, Inc. and Eagle Forum Education and Legal Defense Fund.

Professor Jessica Litman, Wayne State University Law School, Detroit, Michigan; Professor Keith Aoki, University of Oregon School of Law; Professor Ann Bartow, University of South Carolina School of Law; Professor Dan Burk, University of Minnesota; Professor Julie Cohen, Georgetown University School of Law; Professors Christine Haight Farley and Peter Jaszi, Washington College of Law, American University; Professor Lydia Pallas Loren, Lewis and Clark College Northwestern School of Law; Professor Pamela Samuelson, Boalt Hall School of Law, University of California Berkeley; Professor Shubha Ghosh, University at Buffalo, SUNY; Professors Paul J. Heald, Allen Post Professor of Law, L. Ray Patterson, Pope Brock Professor of Law, and Laura N. Gasaway, University of Georgia School of Law; Professor Michael Madison, University of Pittsburgh School of Law; Professor Ruth Okediji, University of Oklahoma Law School; Alfred C. Yen, Associate Dean for Academic Affairs and Professor of Law, Boston College Law School; Professor Diame Zimmerman, New York University School of Law, and Professor Dennis Karjala, Arizona State University College of Law, for amicus Copyright Law Professors.

Before: SCHROEDER, Chief Judge, BEEZER and PAEZ, Circuit Judges.

BEEZER, Circuit Judge:

Plaintiffs are engaged in the commercial recording, distribution and sale of copy-

righted musical compositions and sound recordings. The complaint alleges that Napster, Inc. ("Napster") is a contributory and vicarious copyright infringer. On July 26, 2000, the district court granted plaintiffs' motion for a preliminary injunction. The injunction was slightly modified by written opinion on August 10, 2000. *A & M Records, Inc. v. Napster, Inc.,* 114 F.Supp.2d 896 (N.D.Cal.2000). The district court preliminarily enjoined Napster "from engaging in, or facilitating others in copying, downloading, uploading, transmitting, or distributing plaintiffs' copyrighted musical compositions and sound recordings, protected by either federal or state law, without express permission of the rights owner." *Id.* at 927. Federal Rule of Civil Procedure 65(c) requires successful plaintiffs to post a bond for damages incurred by the enjoined party in the event that the injunction was wrongfully issued. The district court set bond in this case at $5 million.

We entered a temporary stay of the preliminary injunction pending resolution of this appeal. We have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1). We affirm in part, reverse in part and remand.

## I

We have examined the papers submitted in support of and in response to the injunction application and it appears that Napster has designed and operates a system which permits the transmission and retention of sound recordings employing digital technology.

In 1987, the Moving Picture Experts Group set a standard file format for the storage of audio recordings in a digital format called MPEG–3, abbreviated as "MP3." Digital MP3 files are created through a process colloquially called "ripping." Ripping software allows a computer owner to copy an audio compact disk ("audio CD") directly onto a computer's

hard drive by compressing the audio information on the CD into the MP3 format. The MP3's compressed format allows for rapid transmission of digital audio files from one computer to another by electronic mail or any other file transfer protocol.

Napster facilitates the transmission of MP3 files between and among its users. Through a process commonly called "peer-to-peer" file sharing, Napster allows its users to: (1) make MP3 music files stored on individual computer hard drives available for copying by other Napster users; (2) search for MP3 music files stored on other users' computers; and (3) transfer exact copies of the contents of other users' MP3 files from one computer to another via the Internet. These functions are made possible by Napster's MusicShare software, available free of charge from Napster's Internet site, and Napster's network servers and server-side software. Napster provides technical support for the indexing and searching of MP3 files, as well as for its other functions, including a "chat room," where users can meet to discuss music, and a directory where participating artists can provide information about their music.

### A. Accessing the System

In order to copy MP3 files through the Napster system, a user must first access Napster's Internet site and download[1] the MusicShare software to his individual computer. *See http://www.Napster.com.* Once the software is installed, the user can access the Napster system. A first-time user is required to register with the Napster system by creating a "user name" and password.

### B. Listing Available Files

If a registered user wants to list available files stored in his computer's hard drive on Napster for others to access, he

---

**1.** "To download means to receive information, typically a file, from another computer to yours via your modem.... The opposite term is upload, which means to send a file to

another computer." *United States v. Mohrbacher,* 182 F.3d 1041, 1048 (9th Cir.1999) (quoting Robin Williams, *Jargon, An Informal Dictionary of Computer Terms* 170–71 (1993)).

**1012**

must first create a "user library" directory on his computer's hard drive. The user then saves his MP3 files in the library directory, using self-designated file names. He next must log into the Napster system using his user name and password. His MusicShare software then searches his user library and verifies that the available files are properly formatted. If in the correct MP3 format, the names of the MP3 files will be uploaded from the user's computer to the Napster servers. The content of the MP3 files remains stored in the user's computer.

Once uploaded to the Napster servers, the user's MP3 file names are stored in a server-side "library" under the user's name and become part of a "collective directory" of files available for transfer during the time the user is logged onto the Napster system. The collective directory is fluid; it tracks users who are connected in real time, displaying only file names that are immediately accessible.

## C. Searching For Available Files

Napster allows a user to locate other users' MP3 files in two ways: through Napster's search function and through its "hotlist" function.

Software located on the Napster servers maintains a "search index" of Napster's collective directory. To search the files available from Napster users currently connected to the network servers, the individual user accesses a form in the MusicShare software stored in his computer and enters either the name of a song or an artist as the object of the search. The form is then transmitted to a Napster server and automatically compared to the MP3 file names listed in the server's search index. Napster's server compiles a list of all MP3 file names pulled from the search index which include the same search terms entered on the search form and transmits the list to the searching user. The Napster server does not search the contents of any MP3 file; rather, the search is limited to "a text search of the file names indexed in a particular cluster. Those file names may contain typographi-

cal errors or otherwise inaccurate descriptions of the content of the files since they are designated by other users." *Napster,* 114 F.Supp.2d at 906.

To use the "hotlist" function, the Napster user creates a list of other users' names from whom he has obtained MP3 files in the past. When logged onto Napster's servers, the system alerts the user if any user on his list (a "hotlisted user") is also logged onto the system. If so, the user can access an index of all MP3 file names in a particular hotlisted user's library and request a file in the library by selecting the file name. The contents of the hotlisted user's MP3 file are not stored on the Napster system.

## D. Transferring Copies of an MP3 file

To transfer a copy of the contents of a requested MP3 file, the Napster server software obtains the Internet address of the requesting user and the Internet address of the "host user" (the user with the available files). *See generally Brookfield Communications, Inc. v. West Coast Entm't Corp.,* 174 F.3d 1036, 1044 (9th Cir.1999) (describing, in detail, the structure of the Internet). The Napster servers then communicate the host user's Internet address to the requesting user. The requesting user's computer uses this information to establish a connection with the host user and downloads a copy of the contents of the MP3 file from one computer to the other over the Internet, "peer-to-peer." A downloaded MP3 file can be played directly from the user's hard drive using Napster's MusicShare program or other software. The file may also be transferred back onto an audio CD if the user has access to equipment designed for that purpose. In both cases, the quality of the original sound recording is slightly diminished by transfer to the MP3 format.

This architecture is described in some detail to promote an understanding of transmission mechanics as opposed to the content of the transmissions. The content

is the subject of our copyright infringement analysis.

## II

We review a grant or denial of a preliminary injunction for abuse of discretion. *Gorbach v. Reno,* 219 F.3d 1087, 1091 (9th Cir.2000) (en banc). Application of erroneous legal principles represents an abuse of discretion by the district court. *Rucker v. Davis,* 237 F.3d 1113, 1118–19 (9th Cir.2001) (en banc). If the district court is claimed to have relied on an erroneous legal premise in reaching its decision to grant or deny a preliminary injunction, we will review the underlying issue of law de novo. *Id.* at 1118 (citing *Does 1–5 v. Chandler,* 83 F.3d 1150, 1152 (9th Cir. 1996)).

On review, we are required to determine, "whether the court employed the appropriate legal standards governing the issuance of a preliminary injunction and whether the district court correctly apprehended the law with respect to the underlying issues in the case." *Id.* "As long as the district court got the law right, 'it will not be reversed simply because the appellate court would have arrived at a different result if it had applied the law to the facts of the case.'" *Gregorio T. v. Wilson,* 59 F.3d 1002, 1004 (9th Cir.1995) (quoting *Sports Form, Inc. v. United Press, Int'l,* 686 F.2d 750, 752 (9th Cir.1982)).

Preliminary injunctive relief is available to a party who demonstrates either: (1) a combination of probable success on the merits and the possibility of irreparable harm; or (2) that serious questions are raised and the balance of hardships tips in its favor. *Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc.,* 204 F.3d 867, 874 (9th Cir.2000). "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Id.*

## III

Plaintiffs claim Napster users are engaged in the wholesale reproduction and distribution of copyrighted works, all constituting direct infringement.[2] The district court agreed. We note that the district court's conclusion that plaintiffs have presented a prima facie case of direct infringement by Napster users is not presently appealed by Napster. We only need briefly address the threshold requirements.

### A. Infringement

Plaintiffs must satisfy two requirements to present a prima facie case of direct infringement: (1) they must show ownership of the allegedly infringed material and (2) they must demonstrate that the alleged infringers violate at least one exclusive right granted to copyright holders under 17 U.S.C. § 106. *See* 17 U.S.C. § 501(a) (infringement occurs when alleged infringer engages in activity listed in § 106); *see also Baxter v. MCA, Inc.,* 812 F.2d 421, 423 (9th Cir.1987); *see, e.g., S.O.S., Inc. v. Payday, Inc.,* 886 F.2d 1081, 1085 n. 3 (9th Cir.1989) ("The word 'copying' is shorthand for the infringing of any of the copyright owner's five exclusive rights . . . ."). Plaintiffs have sufficiently demonstrated ownership. The record supports the district court's determination that "as much as eighty-seven percent of the files available on Napster may be copyrighted and more than seventy percent may be owned or administered by plaintiffs." *Napster,* 114 F.Supp.2d at 911.

The district court further determined that plaintiffs' exclusive rights under § 106 were violated: "here the evidence estab-

---

**2.** Secondary liability for copyright infringement does not exist in the absence of direct infringement by a third party. *Religious Tech. Ctr. v. Netcom On–Line Communication Servs., Inc.,* 907 F.Supp. 1361, 1371 (N.D.Cal. 1995) ("[T]here can be no contributory in-fringement by a defendant without direct infringement by another."). It follows that Napster does not facilitate infringement of the copyright laws in the absence of direct infringement by its users.

lishes that a majority of Napster users use the service to download and upload copyrighted music.... And by doing that, it constitutes—the uses constitute direct infringement of plaintiffs' musical compositions, recordings." *A & M Records, Inc. v. Napster, Inc.*, Nos. 99–5183, 00–0074, 2000 WL 1009483, at *1 (N.D.Cal. July 26, 2000) (transcript of proceedings). The district court also noted that "it is pretty much acknowledged ... by Napster that this is infringement." *Id.* We agree that plaintiffs have shown that Napster users infringe at least two of the copyright holders' exclusive rights: the rights of reproduction, § 106(1); and distribution, § 106(3). Napster users who upload file names to the search index for others to copy violate plaintiffs' distribution rights. Napster users who download files containing copyrighted music violate plaintiffs' reproduction rights.

Napster asserts an affirmative defense to the charge that its users directly infringe plaintiffs' copyrighted musical compositions and sound recordings.

## B. Fair Use

█ Napster contends that its users do not directly infringe plaintiffs' copyrights because the users are engaged in fair use of the material. *See* 17 U.S.C. § 107 ("[T]he fair use of a copyrighted work ... is not an infringement of copyright."). Napster identifies three specific alleged fair uses: sampling, where users make temporary copies of a work before purchasing; space-shifting, where users access a sound recording through the Napster system that they already own in audio CD format; and permissive distribution of recordings by both new and established artists.

The district court considered factors listed in 17 U.S.C. § 107, which guide a court's fair use determination. These factors are: (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the "amount and substantiality of the portion used" in relation to the work as a whole; and (4) the effect of the use upon the potential market for the work or the value of the work. *See* 17 U.S.C. § 107. The district court first conducted a general analysis of Napster system uses under § 107, and then applied its reasoning to the alleged fair uses identified by Napster. The district court concluded that Napster users are not fair users.[3]

**3.** Napster asserts that because plaintiffs seek injunctive relief, they have the burden of showing a likelihood that they would prevail against any affirmative defenses raised by Napster, including its fair use defense under 17 U.S.C. § 107. *See Atari Games Corp. v. Nintendo*, 975 F.2d 832, 837 (Fed.Cir.1992) (following Ninth Circuit law, and stating that plaintiff must show likelihood of success on prima facie copyright infringement case and likelihood that it would overcome copyright misuse defense); *see also Dr. Seuss Enters. v. Penguin Books USA*, 924 F.Supp. 1559, 1562 (S.D.Cal.1996) ("The plaintiff's burden of showing a likelihood of success on the merits includes the burden of showing a likelihood that it would prevail against any affirmative defenses raised by the defendant."), *aff'd*, 109 F.3d 1394 (9th Cir.1997); *Religious Tech. Ctr. v. Netcom On–Line Communication Servs.*, 923 F.Supp. 1231, 1242 n. 12 (1995) (same); 2 William W. Schwarzer et al., *California Practice Guide, Federal Civil Procedure Before Trial* ¶ 13:47 (2000) (advising that when a preliminary injunction is sought "plaintiff

must demonstrate a likelihood of prevailing on any affirmative defense as well as on plaintiff's case in chief"). *But see Fair Use of Copyrighted Works*, H.R. Rep. 102–836 n.3 (criticizing a Northern District of New York case in which "the district court erroneously held that where the copyright owner seeks a preliminary injunction, the copyright owner bears the burden of disproving the [fair use] defense"); *see also* 1 William F. Patry, *Copyright Law & Practice*, 725, 725 n.27 (1994) (citing cases placing burden on defendant at preliminary injunction stage).

The district court stated that "defendant bears the burden of proving ... affirmative defenses." *Napster*, 114 F.Supp.2d at 912. Plaintiffs assert that the district court did not err in placing the burden on Napster. We conclude that even if plaintiffs bear the burden of establishing that they would likely prevail against Napster's affirmative defenses at the preliminary injunction stage, the record supports the district court's conclusion that Napster users do not engage in fair use of the copyrighted materials.

We agree. We first address the court's overall fair use analysis.

## 1. Purpose and Character of the Use

▮ This factor focuses on whether the new work merely replaces the object of the original creation or instead adds a further purpose or different character. In other words, this factor asks "whether and to what extent the new work is 'transformative.'" *See Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 579, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994).

The district court first concluded that downloading MP3 files does not transform the copyrighted work. *Napster*, 114 F.Supp.2d at 912. This conclusion is supportable. Courts have been reluctant to find fair use when an original work is merely retransmitted in a different medium. *See, e.g., Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d 104, 108 (2d Cir.1998) (concluding that retransmission of radio broadcast over telephone lines is not transformative); *UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F.Supp.2d 349, 351 (S.D.N.Y.) (finding that reproduction of audio CD into MP3 format does not "transform" the work), *certification denied*, 2000 WL 710056 (S.D.N.Y. June 1, 2000) ("Defendant's copyright infringement was clear, and the mere fact that it was clothed in the exotic webbing of the Internet does not disguise its illegality.").

▮ This "purpose and character" element also requires the district court to determine whether the allegedly infringing use is commercial or noncommercial. *See Campbell*, 510 U.S. at 584–85, 114 S.Ct. 1164. A commercial use weighs against a finding of fair use but is not conclusive on the issue. *Id.* The district court determined that Napster users engage in commercial use of the copyrighted materials largely because (1) "a host user sending a file cannot be said to engage in a personal use when distributing that file to an anony-

mous requester" and (2) "Napster users get for free something they would ordinarily have to buy." *Napster*, 114 F.Supp.2d at 912. The district court's findings are not clearly erroneous.

▮ Direct economic benefit is not required to demonstrate a commercial use. Rather, repeated and exploitative copying of copyrighted works, even if the copies are not offered for sale, may constitute a commercial use. *See Worldwide Church of God v. Philadelphia Church of God*, 227 F.3d 1110, 1118 (9th Cir.2000) (stating that church that copied religious text for its members "unquestionably profit[ed]" from the unauthorized "distribution and use of [the text] without having to account to the copyright holder"); *American Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 922 (2d Cir.1994) (finding that researchers at for-profit laboratory gained indirect economic advantage by photocopying copyrighted scholarly articles). In the record before us, commercial use is demonstrated by a showing that repeated and exploitative unauthorized copies of copyrighted works were made to save the expense of purchasing authorized copies. *See Worldwide Church*, 227 F.3d at 1117–18; *Sega Enters. Ltd. v. MAPHIA*, 857 F.Supp. 679, 687 (N.D.Cal.1994) (finding commercial use when individuals downloaded copies of video games "to avoid having to buy video game cartridges"); *see also American Geophysical*, 60 F.3d at 922. Plaintiffs made such a showing before the district court.[4]

We also note that the definition of a financially motivated transaction for the purposes of criminal copyright actions includes trading infringing copies of a work for other items, "including the receipt of other copyrighted works." *See* No Electronic Theft Act ("NET Act"), Pub.L. No. 105–147, 18 U.S.C. § 101 (defining "Financial Gain").

4. Napster counters that even if certain users engage in commercial use by downloading instead of purchasing the music, space-shifting and sampling are nevertheless *non* com-

mercial in nature. We address this contention in our discussion of these specific uses, *infra.*

### 2. The Nature of the Use

 Works that are creative in nature are "closer to the core of intended copyright protection" than are more fact-based works. *See Campbell*, 510 U.S. at 586, 114 S.Ct. 1164. The district court determined that plaintiffs' "copyrighted musical compositions and sound recordings are creative in nature ... which cuts against a finding of fair use under the second factor." *Napster*, 114 F.Supp.2d at 913. We find no error in the district court's conclusion.

### 3. The Portion Used

 "While 'wholesale copying does not preclude fair use per se,' copying an entire work 'militates against a finding of fair use.'" *Worldwide Church*, 227 F.3d at 1118 (quoting *Hustler Magazine, Inc. v. Moral Majority, Inc.*, 796 F.2d 1148, 1155 (9th Cir.1986)). The district court determined that Napster users engage in "wholesale copying" of copyrighted work because file transfer necessarily "involves copying the entirety of the copyrighted work." *Napster*, 114 F.Supp.2d at 913. We agree. We note, however, that under certain circumstances, a court will conclude that a use is fair even when the protected work is copied in its entirety. *See, e.g., Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 449–50, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984) (acknowledging that fair use of time-shifting necessarily involved making a full copy of a protected work).

### 4. Effect of Use on Market

 "Fair use, when properly applied, is limited to copying by others which does not materially impair the marketability of the work which is copied." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 566–67, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). "[T]he importance of this [fourth] factor will vary, not only with the amount of harm, but also with the relative strength of the showing on the other factors." *Campbell*, 510 U.S. at 591 n. 21, 114 S.Ct. 1164. The proof required to demonstrate present or future market harm varies with the purpose and character of the use:

> A challenge to a noncommercial use of a copyrighted work requires proof either that the particular use is harmful, or that if it should become widespread, it would adversely affect the potential market for the copyrighted work.... *If the intended use is for commercial gain, that likelihood [of market harm] may be presumed. But if it is for a noncommercial purpose, the likelihood must be demonstrated.*

*Sony*, 464 U.S. at 451, 104 S.Ct. 774 (emphases added).

Addressing this factor, the district court concluded that Napster harms the market in "at least" two ways: it reduces audio CD sales among college students and it "raises barriers to plaintiffs' entry into the market for the digital downloading of music." *Napster*, 114 F.Supp.2d at 913. The district court relied on evidence plaintiffs submitted to show that Napster use harms the market for their copyrighted musical compositions and sound recordings. In a separate memorandum and order regarding the parties' objections to the expert reports, the district court examined each report, finding some more appropriate and probative than others. *A & M Records, Inc. v. Napster, Inc.*, Nos. 99–5183 & 00–0074, 2000 WL 1170106 (N.D.Cal. August 10, 2000). Notably, plaintiffs' expert, Dr. E. Deborah Jay, conducted a survey (the "Jay Report") using a random sample of college and university students to track their reasons for using Napster and the impact Napster had on their music purchases. *Id.* at *2. The court recognized that the Jay Report focused on just one segment of the Napster user population and found "evidence of lost sales attributable to college use to be probative of irreparable harm for purposes of the preliminary injunction motion." *Id.* at *3.

Plaintiffs also offered a study conducted by Michael Fine, Chief Executive Officer of Soundscan, (the "Fine Report") to determine the effect of online sharing of MP3

files in order to show irreparable harm. Fine found that online file sharing had resulted in a loss of "album" sales within college markets. After reviewing defendant's objections to the Fine Report and expressing some concerns regarding the methodology and findings, the district court refused to exclude the Fine Report insofar as plaintiffs offered it to show irreparable harm. *Id.* at *6.

Plaintiffs' expert Dr. David J. Teece studied several issues ("Teece Report"), including whether plaintiffs had suffered or were likely to suffer harm in their existing and planned businesses due to Napster use. *Id.* Napster objected that the report had not undergone peer review. The district court noted that such reports generally are not subject to such scrutiny and overruled defendant's objections. *Id.*

As for defendant's experts, plaintiffs objected to the report of Dr. Peter S. Fader, in which the expert concluded that Napster is *beneficial* to the music industry because MP3 music file-sharing stimulates more audio CD sales than it displaces. *Id.* at *7. The district court found problems in Dr. Fader's minimal role in overseeing the administration of the survey and the lack of objective data in his report. The court decided the generality of the report rendered it "of dubious reliability and value." The court did not exclude the report, however, but chose "not to rely on Fader's findings in determining the issues of fair use and irreparable harm." *Id.* at *8.

The district court cited both the Jay and Fine Reports in support of its finding that Napster use harms the market for plaintiffs' copyrighted musical compositions and sound recordings by reducing CD sales among college students. The district court cited the Teece Report to show the harm Napster use caused in raising barriers to plaintiffs' entry into the market for digital downloading of music. *Napster,* 114 F.Supp.2d at 910. The district court's careful consideration of defendant's objections to these reports and decision to rely on the reports for specific issues demonstrates a proper exercise of discretion in

addition to a correct application of the fair use doctrine. Defendant has failed to show any basis for disturbing the district court's findings.

■ We, therefore, conclude that the district court made sound findings related to Napster's deleterious effect on the present and future digital download market. Moreover, lack of harm to an established market cannot deprive the copyright holder of the right to develop alternative markets for the works. *See L.A. Times v. Free Republic,* 54 U.S.P.Q.2d 1453, 1469–71 (C.D.Cal.2000) (stating that online market for plaintiff newspapers' articles was harmed because plaintiffs demonstrated that "[defendants] are attempting to exploit the market for viewing their articles online"); *see also UMG Recordings,* 92 F.Supp.2d at 352 ("Any allegedly positive impact of defendant's activities on plaintiffs' prior market in no way frees defendant to usurp a further market that directly derives from reproduction of the plaintiffs' copyrighted works."). Here, similar to *L.A. Times* and *UMG Recordings,* the record supports the district court's finding that the "record company plaintiffs have already expended considerable funds and effort to commence Internet sales and licensing for digital downloads." 114 F.Supp.2d at 915. Having digital downloads available for free on the Napster system necessarily harms the copyright holders' attempts to charge for the same downloads.

Judge Patel did not abuse her discretion in reaching the above fair use conclusions, nor were the findings of fact with respect to fair use considerations clearly erroneous. We next address Napster's identified uses of sampling and space-shifting.

### 5. Identified Uses

Napster maintains that its identified uses of sampling and space-shifting were wrongly excluded as fair uses by the district court.

**1018**

### a. Sampling

■ Napster contends that its users download MP3 files to "sample" the music in order to decide whether to purchase the recording. Napster argues that the district court: (1) erred in concluding that sampling is a commercial use because it conflated a noncommercial use with a personal use; (2) erred in determining that sampling adversely affects the market for plaintiffs' copyrighted music, a requirement if the use is noncommercial; and (3) erroneously concluded that sampling is not a fair use because it determined that samplers may also engage in other infringing activity.

The district court determined that sampling remains a commercial use even if some users eventually purchase the music. We find no error in the district court's determination. Plaintiffs have established that they are likely to succeed in proving that even authorized temporary downloading of individual songs for sampling purposes is commercial in nature. *See Napster*, 114 F.Supp.2d at 913. The record supports a finding that free promotional downloads are highly regulated by the record company plaintiffs and that the companies collect royalties for song samples available on retail Internet sites. *Id.* Evidence relied on by the district court demonstrates that the free downloads provided by the record companies consist of thirty-to-sixty second samples or are full songs programmed to "time out," that is, exist only for a short time on the downloader's computer. *Id.* at 913–14. In comparison, Napster users download a full, free and permanent copy of the recording. *Id.* at 914–15. The determination by the district court as to the commercial purpose and character of sampling is not clearly erroneous.

The district court further found that both the market for audio CDs and market for online distribution are adversely affected by Napster's service. As stated in our discussion of the district court's general fair use analysis: the court did not abuse its discretion when it found that, overall, Napster has an adverse impact on the audio CD and digital download markets. Contrary to Napster's assertion that the district court failed to specifically address the market impact of sampling, the district court determined that "[e]ven if the type of sampling supposedly done on Napster were a non-commercial use, plaintiffs have demonstrated a substantial likelihood that it would adversely affect the potential market for their copyrighted works if it became widespread." *Napster*, 114 F.Supp.2d at 914. The record supports the district court's preliminary determinations that: (1) the more music that sampling users download, the less likely they are to eventually purchase the recordings on audio CD; and (2) even if the audio CD market is not harmed, Napster has adverse effects on the developing digital download market.

Napster further argues that the district court erred in rejecting its evidence that the users' downloading of "samples" increases or tends to increase audio CD sales. The district court, however, correctly noted that "any potential enhancement of plaintiffs' sales ... would not tip the fair use analysis conclusively in favor of defendant." *Id.* at 914. We agree that increased sales of copyrighted material attributable to unauthorized use should not deprive the copyright holder of the right to license the material. *See Campbell*, 510 U.S. at 591 n. 21, 114 S.Ct. 1164 ("Even favorable evidence, without more, is no guarantee of fairness. Judge Leval gives the example of the film producer's appropriation of a composer's previously unknown song that turns the song into a commercial success; the boon to the song does not make the film's simple copying fair."); *see also L.A. Times*, 54 U.S.P.Q.2d at 1471–72. Nor does positive impact in one market, here the audio CD market, deprive the copyright holder of the right to develop identified alternative markets, here the digital download market. *See id.* at 1469–71.

We find no error in the district court's factual findings or abuse of discretion in the court's conclusion that plaintiffs will likely prevail in establishing that sampling does not constitute a fair use.

#### b. Space–Shifting

■ Napster also maintains that space-shifting is a fair use. Space-shifting occurs when a Napster user downloads MP3 music files in order to listen to music he already owns on audio CD. *See id.* at 915–16. Napster asserts that we have already held that space-shifting of musical compositions and sound recordings is a fair use. *See Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc.*, 180 F.3d 1072, 1079 (9th Cir.1999) ("Rio [a portable MP3 player] merely makes copies in order to render portable, or 'space-shift,' those files that already reside on a user's hard drive.... Such copying is a paradigmatic noncommercial personal use."). *See also generally Sony*, 464 U.S. at 423, 104 S.Ct. 774 (holding that "time-shifting," where a video tape recorder owner records a television show for later viewing, is a fair use).

We conclude that the district court did not err when it refused to apply the "shifting" analyses of *Sony* and *Diamond*. Both *Diamond* and *Sony* are inapposite because the methods of shifting in these cases did not also simultaneously involve distribution of the copyrighted material to the general public; the time or space-shifting of copyrighted material exposed the material only to the original user. In *Diamond*, for example, the copyrighted music was transferred from the user's computer hard drive to the user's portable MP3 player. So too *Sony*, where "the majority of VCR purchasers ... did not distribute taped television broadcasts, but merely enjoyed them at home." *Napster*, 114 F.Supp.2d at 913. Conversely, it is obvious that once a user lists a copy of music he already owns on the Napster system in order to access the music from another location, the song becomes "available to millions of other individuals," not just the original CD owner. *See UMG*

*Recordings*, 92 F.Supp.2d at 351–52 (finding space-shifting of MP3 files not a fair use even when previous ownership is demonstrated before a download is allowed); *cf. Religious Tech. Ctr. v. Lerma*, No. 95–1107A, 1996 WL 633131, at *6 (E.D.Va. Oct.4, 1996) (suggesting that storing copyrighted material on computer disk for later review is not a fair use).

#### c. Other Uses

Permissive reproduction by either independent or established artists is the final fair use claim made by Napster. The district court noted that plaintiffs did not seek to enjoin this and any other noninfringing use of the Napster system, including: chat rooms, message boards and Napster's New Artist Program. *Napster*, 114 F.Supp.2d at 917. Plaintiffs do not challenge these uses on appeal.

We find no error in the district court's determination that plaintiffs will likely succeed in establishing that Napster users do not have a fair use defense. Accordingly, we next address whether Napster is secondarily liable for the direct infringement under two doctrines of copyright law: contributory copyright infringement and vicarious copyright infringement.

### IV

■ We first address plaintiffs' claim that Napster is liable for contributory copyright infringement. Traditionally, "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer." *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir.1971); *see also Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir.1996). Put differently, liability exists if the defendant engages in "personal conduct that encourages or assists the infringement." *Matthew Bender & Co. v. West Publ'g Co.*, 158 F.3d 693, 706 (2d Cir.1998).

The district court determined that plaintiffs in all likelihood would establish Napster's liability as a contributory infringer. The district court did not err; Napster, by its conduct, knowingly encourages and assists the infringement of plaintiffs' copyrights.

### A. Knowledge

 Contributory liability requires that the secondary infringer "know or have reason to know" of direct infringement. *Cable/Home Communication Corp. v. Network Prods., Inc.*, 902 F.2d 829, 845 & 846 n. 29 (11th Cir.1990); *Religious Tech. Ctr. v. Netcom On-Line Communication Servs., Inc.*, 907 F.Supp. 1361, 1373–74 (N.D.Cal.1995) (framing issue as "whether Netcom knew or should have known of" the infringing activities). The district court found that Napster had both actual and constructive knowledge that its users exchanged copyrighted music. The district court also concluded that the law does not require knowledge of "specific acts of infringement" and rejected Napster's contention that because the company cannot distinguish infringing from noninfringing files, it does not "know" of the direct infringement. 114 F.Supp.2d at 917.

It is apparent from the record that Napster has knowledge, both actual and constructive,[5] of direct infringement. Napster claims that it is nevertheless protected from contributory liability by the teaching of *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). We disagree. We observe that Napster's actual, specific knowledge of direct infringement renders *Sony*'s holding of limited assistance to Napster. We are compelled to make a clear distinction between the architecture of the Napster system and Napster's conduct in relation to the operational capacity of the system.

The *Sony* Court refused to hold the manufacturer and retailers of video tape recorders liable for contributory infringement despite evidence that such machines could be and were used to infringe plaintiffs' copyrighted television shows. *Sony* stated that if liability "is to be imposed on petitioners in this case, it must rest on the fact that *they have sold equipment with constructive knowledge of the fact that their customers may use that equipment to make unauthorized copies* of copyrighted material." *Id.* at 439, 104 S.Ct. 774 (emphasis added). The *Sony* Court declined to impute the requisite level of knowledge where the defendants made and sold equipment capable of both infringing and "substantial noninfringing uses." *Id.* at 442 (adopting a modified "staple article of commerce" doctrine from patent law). *See also Universal City Studios, Inc. v. Sony Corp.*, 480 F.Supp. 429, 459 (C.D.Cal. 1979) ("This court agrees with defendants that their knowledge was insufficient to make them contributory infringers."), *rev'd*, 659 F.2d 963 (9th Cir.1981), *rev'd*, 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984); Alfred C. Yen, *Internet Service Provider Liability for Subscriber Copyright Infringement, Enterprise Liability, and the First Amendment*, 88 Geo. L.J. 1833, 1874 & 1893 n.210 (2000) (suggesting that, after *Sony*, most Internet service providers lack "the requisite level of knowledge" for the imposition of contributory liability).

 We are bound to follow *Sony*, and will not impute the requisite level of knowledge to Napster merely because

5. The district court found actual knowledge because: (1) a document authored by Napster co-founder Sean Parker mentioned "the need to remain ignorant of users' real names and IP addresses 'since they are exchanging pirated music' "; and (2) the Recording Industry Association of America ("RIAA") informed Napster of more than 12,000 infringing files, some of which are still available. 114 F.Supp.2d at 918. The district court found constructive knowledge because: (a) Napster executives have recording industry experience; (b) they have enforced intellectual property rights in other instances; (c) Napster executives have downloaded copyrighted songs from the system; and (d) they have promoted the site with "screen shots listing infringing files." *Id.* at 919.

peer-to-peer file sharing technology may be used to infringe plaintiffs' copyrights. *See* 464 U.S. at 436, 104 S.Ct. 774 (rejecting argument that merely supplying the " 'means' to accomplish an infringing activity" leads to imposition of liability). We depart from the reasoning of the district court that Napster failed to demonstrate that its system is capable of commercially significant noninfringing uses. *See Napster*, 114 F.Supp.2d at 916, 917–18. The district court improperly confined the use analysis to current uses, ignoring the system's capabilities. *See generally Sony*, 464 U.S. at 442–43, 104 S.Ct. 774 (framing inquiry as whether the video tape recorder is "*capable* of commercially significant noninfringing uses") (emphasis added). Consequently, the district court placed undue weight on the proportion of current infringing use as compared to current and future noninfringing use. *See generally Vault Corp. v. Quaid Software Ltd.*, 847 F.2d 255, 264–67 (5th Cir.1988) (single noninfringing use implicated *Sony*). Nonetheless, whether we might arrive at a different result is not the issue here. *See Sports Form, Inc. v. United Press Int'l, Inc.*, 686 F.2d 750, 752 (9th Cir.1982). The instant appeal occurs at an early point in the proceedings and "the fully developed factual record may be materially different from that initially before the district court...." *Id.* at 753. Regardless of the number of Napster's infringing versus noninfringing uses, the evidentiary record here supported the district court's finding that plaintiffs would likely prevail in establishing that Napster knew or had reason to know of its users' infringement of plaintiffs' copyrights.

This analysis is similar to that of *Religious Technology Center v. Netcom On-Line Communication Services, Inc.*, which suggests that in an online context, evidence of actual knowledge of specific acts of infringement is required to hold a computer system operator liable for contributory copyright infringement. 907 F.Supp. at 1371. *Netcom* considered the potential contributory copyright liability of a computer bulletin board operator whose system supported the posting of infringing material. *Id.* at 1374. The court, in denying Netcom's motion for summary judgment of noninfringement and plaintiff's motion for judgment on the pleadings, found that a disputed issue of fact existed as to whether the operator had sufficient knowledge of infringing activity. *Id.* at 1374–75.

The court determined that for the operator to have sufficient knowledge, the copyright holder must "provide the necessary documentation to show there is likely infringement." 907 F.Supp. at 1374; *cf. Cubby, Inc. v. CompuServe, Inc.*, 776 F.Supp. 135, 141 (S.D.N.Y.1991) (recognizing that online service provider does not and cannot examine every hyperlink for potentially defamatory material). If such documentation was provided, the court reasoned that Netcom would be liable for contributory infringement because its failure to remove the material "and thereby stop an infringing copy from being distributed worldwide constitutes substantial participation" in distribution of copyrighted material. *Id.*

█ We agree that if a computer system operator learns of specific infringing material available on his system and fails to purge such material from the system, the operator knows of and contributes to direct infringement. *See Netcom*, 907 F.Supp. at 1374. Conversely, absent any specific information which identifies infringing activity, a computer system operator cannot be liable for contributory infringement merely because the structure of the system allows for the exchange of copyrighted material. *See Sony*, 464 U.S. at 436, 442–43, 104 S.Ct. 774. To enjoin simply because a computer network allows for infringing use would, in our opinion, violate *Sony* and potentially restrict activity unrelated to infringing use.

We nevertheless conclude that sufficient knowledge exists to impose contributory liability when linked to demonstrated infringing use of the Napster system. *See Napster*, 114 F.Supp.2d at 919 ("*Religious*

*Technology Center* would not mandate a determination that Napster, Inc. lacks the knowledge requisite to contributory infringement."). The record supports the district court's finding that Napster has *actual* knowledge that *specific* infringing material is available using its system, that it could block access to the system by suppliers of the infringing material, and that it failed to remove the material. *See Napster,* 114 F.Supp.2d at 918, 920–21.[6]

## B. Material Contribution

Under the facts as found by the district court, Napster materially contributes to the infringing activity. Relying on *Fonovisa,* the district court concluded that "[w]ithout the support services defendant provides, Napster users could not find and download the music they want with the ease of which defendant boasts." *Napster,* 114 F.Supp.2d at 919–20 ("Napster is an integrated service designed to enable users to locate and download MP3 music files."). We agree that Napster provides "the site and facilities" for direct infringement. *See Fonovisa,* 76 F.3d at 264; *cf. Netcom,* 907 F.Supp. at 1372 ("Netcom will be liable for contributory infringement since its failure to cancel [a user's] infringing message and thereby stop an infringing copy from being distributed worldwide constitutes substantial participation."). The district court correctly applied the reasoning in *Fonovisa,* and properly found that Napster materially contributes to direct infringement.

We affirm the district court's conclusion that plaintiffs have demonstrated a likelihood of success on the merits of the contributory copyright infringement claim. We will address the scope of the injunction in part VIII of this opinion.

### V

We turn to the question whether Napster engages in vicarious copyright infringement. Vicarious copyright liability is an "outgrowth" of respondeat superior. *Fonovisa,* 76 F.3d at 262. In the context of copyright law, vicarious liability extends beyond an employer/employee relationship to cases in which a defendant "has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities." *Id.* (quoting *Gershwin,* 443 F.2d at 1162); *see also Polygram Int'l Publ'g, Inc. v. Nevada/TIG, Inc.,* 855 F.Supp. 1314, 1325–26 (D.Mass.1994) (describing vicarious liability as a form of risk allocation).

Before moving into this discussion, we note that *Sony*'s "staple article of commerce" analysis has no application to Napster's potential liability for vicarious copyright infringement. *See Sony,* 464 U.S. at 434–435, 104 S.Ct. 774; *see generally* 3 Melville B. Nimmer & David Nimmer, *Nimmer On Copyright* §§ 12.04[A][2] & [A][2][b] (2000) (confining *Sony* to contributory infringement analysis: "Contributory infringement itself is of two types—personal conduct that forms part of or furthers the infringement and contribution of machinery or goods that provide the means to infringe"). 617 PLI/Pat 455, 528 (Sept. 2, 2000) (indicating that the "staple article of commerce" doctrine "provides a defense only to contributory infringement, not to vicarious infringement"). The issues of Sony's liability under the "doctrines of 'direct infringement' and 'vicarious liability'" were not before the Supreme Court, although the Court recognized that the "lines between direct infringement, contributory infringement, and vicarious liability are not clearly drawn." *Id.* at 435 n. 17, 104 S.Ct. 774. Consequently, when the *Sony* Court used the term "vicarious

---

6. As stated by the district court:

Plaintiff[s] ... demonstrate that defendant had actual notice of direct infringement because the RIAA informed it of more than 12,000 infringing files. See Creighton 12/3/99 Dec., Exh. D. Although Napster, Inc. purportedly terminated the users offer-

ing these files, the songs are still available using the Napster service, as are the copyrighted works which the record company plaintiffs identified in Schedules A and B of their complaint. See Creighton Supp. Dec. ¶¶ 3–4.

114 F.Supp.2d at 918.

liability," it did so broadly and outside of a technical analysis of the doctrine of vicarious copyright infringement. *Id.* at 435 ("[V]icarious liability is imposed in virtually all areas of the law, and the concept of contributory infringement is merely a species of the broader problem of identifying the circumstances in which it is just to hold one individual accountable for the actions of another."); *see also Black's Law Dictionary* 927 (7th ed. 1999) (defining "vicarious liability" in a manner similar to the definition used in *Sony*).

## A. Financial Benefit

█ The district court determined that plaintiffs had demonstrated they would likely succeed in establishing that Napster has a direct financial interest in the infringing activity. *Napster*, 114 F.Supp.2d at 921–22. We agree. Financial benefit exists where the availability of infringing material "acts as a 'draw' for customers." *Fonovisa*, 76 F.3d at 263–64 (stating that financial benefit may be shown "where infringing performances enhance the attractiveness of a venue"). Ample evidence supports the district court's finding that Napster's future revenue is directly dependent upon "increases in userbase." More users register with the Napster system as the "quality and quantity of available music increases." 114 F.Supp.2d at 902. We conclude that the district court did not err in determining that Napster financially benefits from the availability of protected works on its system.

## B. Supervision

The district court determined that Napster has the right and ability to supervise its users' conduct. *Napster*, 114 F.Supp.2d at 920–21 (finding that Napster's representations to the court regarding "its improved methods of blocking users about whom rights holders complain ... is tantamount to an admission that defendant can, and sometimes does, police its service"). We agree in part.

The ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise. *See Fonovisa*, 76 F.3d at 262 ("Cherry Auction had the right to terminate vendors for any reason whatsoever and through that right had the ability to control the activities of vendors on the premises."); *cf. Netcom*, 907 F.Supp. at 1375–76 (indicating that plaintiff raised a genuine issue of fact regarding ability to supervise by presenting evidence that an electronic bulletin board service can suspend subscriber's accounts). Here, plaintiffs have demonstrated that Napster retains the right to control access to its system. Napster has an express reservation of rights policy, stating on its website that it expressly reserves the "right to refuse service and terminate accounts in [its] discretion, including, but not limited to, if Napster believes that user conduct violates applicable law ... or for any reason in Napster's sole discretion, with or without cause."

█ To escape imposition of vicarious liability, the reserved right to police must be exercised to its fullest extent. Turning a blind eye to detectable acts of infringement for the sake of profit gives rise to liability. *See, e.g., Fonovisa*, 76 F.3d at 261 ("There is no dispute for the purposes of this appeal that Cherry Auction and its operators were aware that vendors in their swap meets were selling counterfeit recordings."); *see also Gershwin*, 443 F.2d at 1161–62 (citing *Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304 (2d Cir. 1963), for the proposition that "failure to police the conduct of the primary infringer" leads to imposition of vicarious liability for copyright infringement).

The district court correctly determined that Napster had the right and ability to police its system and failed to exercise that right to prevent the exchange of copyrighted material. The district court, however, failed to recognize that the boundaries of the premises that Napster "controls and patrols" are limited. *See, e.g., Fonovisa*, 76 F.3d at 262–63 (in addition to having the right to exclude vendors, defendant "controlled and patrolled" the premises); *see also Polygram*, 855 F.Supp. at 1328–29 (in addition to having the contractual right to remove exhibitors, trade show operator reserved the right to police during the show and had its "employees walk the

aisles to ensure 'rules compliance'"). Put differently, Napster's reserved "right and ability" to police is cabined by the system's current architecture. As shown by the record, the Napster system does not "read" the content of indexed files, other than to check that they are in the proper MP3 format.

Napster, however, has the ability to locate infringing material listed on its search indices, and the right to terminate users' access to the system. The file name indices, therefore, are within the "premises" that Napster has the ability to police. We recognize that the files are user-named and may not match copyrighted material exactly (for example, the artist or song could be spelled wrong). For Napster to function effectively, however, file names must reasonably or roughly correspond to the material contained in the files, otherwise no user could ever locate any desired music. As a practical matter, Napster, its users and the record company plaintiffs have equal access to infringing material by employing Napster's "search function."

Our review of the record requires us to accept the district court's conclusion that plaintiffs have demonstrated a likelihood of success on the merits of the vicarious copyright infringement claim. Napster's failure to police the system's "premises," combined with a showing that Napster financially benefits from the continuing availability of infringing files on its system, leads to the imposition of vicarious liability. We address the scope of the injunction in part VIII of this opinion.

## VI

We next address whether Napster has asserted defenses which would preclude the entry of a preliminary injunction.

Napster alleges that two statutes insulate it from liability. First, Napster asserts that its users engage in actions protected by § 1008 of the Audio Home Recording Act of 1992, 17 U.S.C. § 1008. Second, Napster argues that its liability for contributory and vicarious infringement is limited by the Digital Millennium Copyright Act, 17 U.S.C. § 512. We address the application of each statute in turn.

A. Audio Home Recording Act

The statute states in part:

*No action may be brought under this title alleging infringement of copyright* based on the manufacture, importation, or distribution of a digital audio recording device, a digital audio recording medium, an analog recording device, or an analog recording medium, or *based on the noncommercial use by a consumer of such a device or medium* for making digital musical recordings or analog musical recordings.

17 U.S.C. § 1008 (emphases added). Napster contends that MP3 file exchange is the type of "noncommercial use" protected from infringement actions by the statute. Napster asserts it cannot be secondarily liable for users' nonactionable exchange of copyrighted musical recordings.

The district court rejected Napster's argument, stating that the Audio Home Recording Act is "irrelevant" to the action because: (1) plaintiffs did not bring claims under the Audio Home Recording Act; and (2) the Audio Home Recording Act does not cover the downloading of MP3 files. *Napster*, 114 F.Supp.2d at 916 n. 19.

We agree with the district court that the Audio Home Recording Act does not cover the downloading of MP3 files to computer hard drives. First, "[u]nder the plain meaning of the Act's definition of digital audio recording devices, computers (and their hard drives) are not digital audio recording devices because their 'primary purpose' is not to make digital audio copied recordings." *Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc.,* 180 F.3d 1072, 1078 (9th Cir.1999). Second, notwithstanding Napster's claim that computers are "digital audio recording devices," computers do not make "digital music recordings" as defined by the Audio Home Recording Act. *Id.* at 1077 (citing S. Rep. 102–294) ("There are simply no

grounds in either the plain language of the definition or in the legislative history for interpreting the term 'digital musical recording' to include songs fixed on computer hard drives.").

### B. Digital Millennium Copyright Act

■ Napster also interposes a statutory limitation on liability by asserting the protections of the "safe harbor" from copyright infringement suits for "Internet service providers" contained in the Digital Millennium Copyright Act, 17 U.S.C. § 512. *See Napster,* 114 F.Supp.2d at 919 n. 24. The district court did not give this statutory limitation any weight favoring a denial of temporary injunctive relief. The court concluded that Napster "has failed to persuade this court that subsection 512(d) shelters contributory infringers." *Id.*

We need not accept a blanket conclusion that § 512 of the Digital Millennium Copyright Act will never protect secondary infringers. *See* S. Rep. 105–190, at 40 (1998) ("The limitations in subsections (a) through (d) protect qualifying service providers from liability for all monetary relief for direct, vicarious, and contributory infringement."), *reprinted in* Melville B. Nimmer & David Nimmer, *Nimmer on Copyright: Congressional Committee Reports on the Digital Millennium Copyright Act and Concurrent Amendments* (2000); *see also* Charles S. Wright, *Actual Versus Legal Control: Reading Vicarious Liability for Copyright Infringement Into the Digital Millennium Copyright Act of 1998,* 75 Wash. L.Rev. 1005, 1028–31 (July 2000) ("[T]he committee reports leave no doubt that Congress intended to provide some relief from vicarious liability").

We do not agree that Napster's potential liability for contributory and vicarious infringement renders the Digital Millennium Copyright Act inapplicable per se. We instead recognize that this issue will be more fully developed at trial. At this stage of the litigation, plaintiffs raise serious questions regarding Napster's ability to obtain shelter under § 512, and plaintiffs also demonstrate that the balance of hardships tips in their favor. *See Pruden-*

*tial Real Estate,* 204 F.3d at 874; *see also Micro Star v. Formgen, Inc.* 154 F.3d 1107, 1109 (9th Cir.1998) ("A party seeking a preliminary injunction must show ... 'that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor.' ").

Plaintiffs have raised and continue to raise significant questions under this statute, including: (1) whether Napster is an Internet service provider as defined by 17 U.S.C. § 512(d); (2) whether copyright owners must give a service provider "official" notice of infringing activity in order for it to have knowledge or awareness of infringing activity on its system; and (3) whether Napster complies with § 512(i), which requires a service provider to timely establish a detailed copyright compliance policy. *See A & M Records, Inc. v. Napster, Inc.,* No. 99–05183, 2000 WL 573136 (N.D.Cal. May 12, 2000) (denying summary judgment to Napster under a different subsection of the Digital Millennium Copyright Act, § 512(a)).

The district court considered ample evidence to support its determination that the balance of hardships tips in plaintiffs' favor:

> Any destruction of Napster, Inc. by a preliminary injunction is speculative compared to the statistical evidence of massive, unauthorized downloading and uploading of plaintiffs' copyrighted works-as many as 10,000 files per second by defendant's own admission. *See* Kessler Dec. ¶ 29. The court has every reason to believe that, without a preliminary injunction, these numbers will mushroom as Napster users, and newcomers attracted by the publicity, scramble to obtain as much free music as possible before trial.

114 F.Supp.2d at 926.

### VII

Napster contends that even if the district court's preliminary determinations that it is liable for facilitating copyright infringement are correct, the district court

improperly rejected valid affirmative defenses of waiver, implied license and copyright misuse. We address the defenses in turn.

## A. Waiver

██ "Waiver is the intentional relinquishment of a known right with knowledge of its existence and the intent to relinquish it." *United States v. King Features Entm't, Inc.*, 843 F.2d 394, 399 (9th Cir.1988). In copyright, waiver or abandonment of copyright "occurs only if there is an intent by the copyright proprietor to surrender rights in his work." 4 Melville B. Nimmer & David Nimmer, *Nimmer On Copyright* ¶ 13.06 (2000); *see also Micro Star v. Formgen, Inc.*, 154 F.3d 1107, 1114 (9th Cir.1998) (discussing abandonment).

██ Napster argues that the district court erred in not finding that plaintiffs knowingly provided consumers with technology designed to copy and distribute MP3 files over the Internet and, thus, waived any legal authority to exercise exclusive control over creation and distribution of MP3 files. The district court, however, was not convinced "that the record companies created the monster that is now devouring their intellectual property rights." *Napster*, 114 F.Supp.2d at 924. We find no error in the district court's finding that "in hastening the proliferation of MP3 files, plaintiffs did [nothing] more than seek partners for their commercial downloading ventures and develop music players for files they planned to sell over the Internet." *Id.*[7]

## B. Implied License

██ Napster also argues that plaintiffs granted the company an implied license by encouraging MP3 file exchange over the Internet. Courts have found implied licenses only in "narrow" circumstances where one party "created a work at [the other's] request and handed it over, intending that [the other] copy and distribute it." *SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharms., Inc.*, 211 F.3d 21, 25 (2d Cir.2000) (quoting *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558 (9th Cir.1990)), *cert. denied*, —— U.S. ——, 121 S.Ct. 173, 148 L.Ed.2d 118 (2000). The district court observed that no evidence exists to support this defense: "indeed, the RIAA gave defendant express notice that it objected to the availability of its members' copyrighted music on Napster." *Napster*, 114 F.Supp.2d at 924–25. The record supports this conclusion.

## C. Misuse

██ The defense of copyright misuse forbids a copyright holder from "secur[ing] an exclusive right or limited monopoly not granted by the Copyright Office." *Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 977–79 (4th Cir.1990), *quoted in Practice Mgmt. Info. Corp. v. American Med. Ass'n*, 121 F.3d 516, 520 (9th Cir.), *amended by* 133 F.3d 1140 (9th Cir.1997). Napster alleges that online distribution is not within the copyright monopoly. According to Napster, plaintiffs have colluded to "use their copyrights to extend their control to online distributions."

We find no error in the district court's preliminary rejection of this affirmative defense. The misuse defense prevents copyright holders from leveraging their limited monopoly to allow them control of areas outside the monopoly. *See Lasercomb*, 911 F.2d at 976–77; *see also Reli-*

---

7. Napster additionally asserts that the district court improperly refused to allow additional discovery into affirmative defenses and also erroneously failed to hold an evidentiary hearing. The denial of an evidentiary hearing is reviewed for abuse of discretion, *Kenneally v. Lungren*, 967 F.2d 329, 335 (9th Cir.1992), as is the court's decision to deny further discovery. *See Sablan v. Dep't of Finance*, 856 F.2d 1317, 1321 (9th Cir.1988) (stating that decision to deny discovery will not be disturbed except upon a clear showing "that the denial of discovery results in actual and substantial prejudice"). We conclude that the court did not abuse its discretion in denying further discovery and refusing to conduct an evidentiary hearing.

*gious Tech. Ctr. v. Lerma,* No. 95–1107A, 1996 WL 633131, at *11 (E.D.Va. Oct.4, 1996) (listing circumstances which indicate improper leverage).[8] There is no evidence here that plaintiffs seek to control areas outside of their grant of monopoly. Rather, plaintiffs seek to control reproduction and distribution of their copyrighted works, exclusive rights of copyright holders. 17 U.S.C. § 106; *see also, e.g., UMG Recordings,* 92 F.Supp.2d at 351 ("A [copyright holder's] 'exclusive' rights, derived from the Constitution and the Copyright Act, include the right, within broad limits, to curb the development of such a derivative market by refusing to license a copyrighted work or by doing so only on terms the copyright owner finds acceptable."). That the copyrighted works are transmitted in another medium-MP3 format rather than audio CD-has no bearing on our analysis. *See id.* at 351 (finding that reproduction of audio CD into MP3 format does not "transform" the work).

### VIII

The district court correctly recognized that a preliminary injunction against Napster's participation in copyright infringement is not only warranted but required. We believe, however, that the scope of the injunction needs modification in light of our opinion. Specifically, we reiterate that contributory liability may potentially be imposed only to the extent that Napster: (1) receives reasonable knowledge of specific infringing files with copyrighted musical compositions and sound recordings; (2) knows or should know that such files are available on the Napster system; and (3)

fails to act to prevent viral distribution of the works. *See Netcom,* 907 F.Supp. at 1374–75. The mere existence of the Napster system, absent actual notice and Napster's demonstrated failure to remove the offending material, is insufficient to impose contributory liability. *See Sony,* 464 U.S. at 442–43, 104 S.Ct. 774.

Conversely, Napster may be vicariously liable when it fails to affirmatively use its ability to patrol its system and preclude access to potentially infringing files listed in its search index. Napster has both the ability to use its search function to identify infringing musical recordings and the right to bar participation of users who engage in the transmission of infringing files.

■ The preliminary injunction which we stayed is overbroad because it places on Napster the entire burden of ensuring that no "copying, downloading, uploading, transmitting, or distributing" of plaintiffs' works occur on the system. As stated, we place the burden on plaintiffs to provide notice to Napster of copyrighted works and files containing such works available on the Napster system before Napster has the duty to disable access to the offending content. Napster, however, also bears the burden of policing the system within the limits of the system. Here, we recognize that this is not an exact science in that the files are user named. In crafting the injunction on remand, the district court should recognize that Napster's system does not currently appear to allow Napster access to users' MP3 files.

■ Based on our decision to remand, Napster's additional arguments on appeal

---

8. The district court correctly stated that "most of the cases" that recognize the affirmative defense of copyright misuse involve unduly restrictive licensing schemes. *See Napster,* 114 F.Supp.2d at 923; *see also Lasercomb,* 911 F.2d at 973 (stating that "a misuse of copyright defense is inherent in the law of copyright"). We have also suggested, however, that a unilateral refusal to license a copyright may constitute wrongful exclusionary conduct giving rise to a claim of misuse, but assume that the "desire to exclude others ...

is a presumptively valid business justification for any immediate harm to consumers." *See Image Tech. Servs. v. Eastman Kodak Co.,* 125 F.3d 1195, 1218 (9th Cir.1997). *But see Intergraph Corp. v. Intel Corp.,* 195 F.3d 1346, 1362 (Fed.Cir.1999) ("[M]arket power does not 'impose on the intellectual property owner an obligation to license the use of that property to others.' ") (quoting United States Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidelines for the Licensing of Intellectual Property* 4 (1995)).

going to the scope of the injunction need not be addressed. We, however, briefly address Napster's First Amendment argument so that it is not reasserted on remand. Napster contends that the present injunction violates the First Amendment because it is broader than necessary. The company asserts two distinct free speech rights: (1) its right to publish a "directory" (here, the search index) and (2) its users' right to exchange information. We note that First Amendment concerns in copyright are allayed by the presence of the fair use doctrine. *See* 17 U.S.C. § 107; *see generally Nihon Keizai Shimbun v. Comline Business Data, Inc.,* 166 F.3d 65, 74 (2d Cir.1999); *Netcom,* 923 F.Supp. at 1258 (stating that the Copyright Act balances First Amendment concerns with the rights of copyright holders). There was a preliminary determination here that Napster users are not fair users. Uses of copyrighted material that are not fair uses are rightfully enjoined. *See Dr. Seuss Enters. v. Penguin Books USA, Inc.,* 109 F.3d 1394, 1403 (9th Cir.1997) (rejecting defendants' claim that injunction would constitute a prior restraint in violation of the First Amendment).

## IX

We address Napster's remaining arguments: (1) that the court erred in setting a $5 million bond, and (2) that the district court should have imposed a constructive royalty payment structure in lieu of an injunction.

## A. Bond

■ Napster argues that the $5 million bond is insufficient because the company's value is between $1.5 and $2 billion. We review objections to the amount of a bond for abuse of discretion. *Walczak v. EPL Prolong, Inc.,* 198 F.3d 725 (9th Cir.1999).

We are reluctant to dramatically raise bond amounts on appeal. *See GoTo.com, Inc. v. The Walt Disney Co.,* 202 F.3d 1199, 1211 (9th Cir.2000); *see also* Fed. R.Civ.P. 65(c). The district court considered competing evidence of Napster's val-

ue and the deleterious effect that any injunction would have upon the Napster system. We cannot say that Judge Patel abused her discretion when she fixed the penal sum required for the bond.

## B. Royalties

■ Napster contends that the district court should have imposed a monetary penalty by way of a compulsory royalty in place of an injunction. We are asked to do what the district court refused.

Napster tells us that "where great public injury would be worked by an injunction, the courts might ... award damages or a continuing royalty instead of an injunction in such special circumstances." *Abend v. MCA, Inc.,* 863 F.2d 1465, 1479 (9th Cir.1988) (quoting 3 Melville B. Nimmer & David Nimmer, *Nimmer On Copyright* § 14.06[B] (1988)), *aff'd,* 495 U.S. 207, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990). We are at a total loss to find any "special circumstances" simply because this case requires us to apply well-established doctrines of copyright law to a new technology. Neither do we agree with Napster that an injunction would cause "great public injury." Further, we narrowly construe any suggestion that compulsory royalties are appropriate in this context because Congress has arguably limited the application of compulsory royalties to specific circumstances, none of which are present here. *See* 17 U.S.C. § 115.

The Copyright Act provides for various sanctions for infringers. *See, e.g.,* 17 U.S.C. §§ 502 (injunctions); 504 (damages); and 506 (criminal penalties); *see also* 18 U.S.C. § 2319A (criminal penalties for the unauthorized fixation of and trafficking in sound recordings and music videos of live musical performances). These statutory sanctions represent a more than adequate legislative solution to the problem created by copyright infringement.

Imposing a compulsory royalty payment schedule would give Napster an "easy out" of this case. If such royalties were im-

posed, Napster would avoid penalties for any future violation of an injunction, statutory copyright damages and any possible criminal penalties for continuing infringement. The royalty structure would also grant Napster the luxury of either choosing to continue and pay royalties or shut down. On the other hand, the wronged parties would be forced to do business with a company that profits from the wrongful use of intellectual properties. Plaintiffs would lose the power to control their intellectual property: they could not make a business decision *not* to license their property to Napster, and, in the event they planned to do business with Napster, compulsory royalties would take away the copyright holders' ability to negotiate the terms of any contractual arrangement.

## X

We affirm in part, reverse in part and remand.

We direct that the preliminary injunction fashioned by the district court prior to this appeal shall remain stayed until it is modified by the district court to conform to the requirements of this opinion. We order a partial remand of this case on the date of the filing of this opinion for the limited purpose of permitting the district court to proceed with the settlement and entry of the modified preliminary injunction.

Even though the preliminary injunction requires modification, appellees have substantially and primarily prevailed on appeal. Appellees shall recover their statutory costs on appeal. *See* Fed. R.App. P. 39(a)(4) ("[i]f a judgment is affirmed in part, reversed in part, modified, or vacated, costs are taxed only as the court orders.").

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.