UMG RECORDINGS, INC.; Arista Records, Inc.; Atlantic Recording Corporation; BMG Music; Capitol Records, Inc.; Elektra Entertainment Group Inc.; Fonovisa, Inc.; Hollywood Records, Inc.; Interscope Records; J Records LLC; Motown Record Company, L.P.; Musical Production, Inc.; Platano Records Corporation; Priority Records L.L.C.; Skg Music LLC; Sony Discos Inc.; Sony Music Entertainment Inc.; The RCA Records Label, A Unit of BMG Music; Virgin Records America, Inc.; Warner Bros. Records Inc.; Warner Music Latina Inc.; Wea International Inc.; and Zomba Recording Corporation, Plaintiffs,

v.

Richard SINNOTT, dba, Marysville Flea Market, Defendant.

No. CIV.S 02–2153 MCE PA.

United States District Court, E.D. California.

Feb. 5, 2004.

Jeffrey G. Knowles, Julia D. Greer, Coblentz, Patch, Duffy & Bass LLP, San Francisco, CA, Russell J. Frackman, Jeffrey D. Goldman, Eric J. German, Mitchell Silberberg and Knupp, LLP, Los Angeles, CA, Matthew J. Oppenheim, Stanley Pierre-Louis, Recording Industry Association of America, Inc., Washington, DC, for plaintiff.

Mark Raymond Leonard, Davis and Leonard, Sacramento, CA, for defendant.

## MEMORANDUM AND ORDER

**MORRISON C. ENGLAND, JR., District Judge.**

Plaintiffs, twenty three recording companies, filed this suit against Defendant Richard Sinnott ("Sinnott"), owner and operator of the Marysville Flea Market ("MFM"), seeking to hold him responsible for the infringement of many of the copyrights Plaintiffs own. The infringement was committed not by Sinnott directly, but rather by several MFM vendors who were selling pirated or counterfeit music. By this motion, Plaintiffs contend that they are entitled to summary judgment as to Sinnott's liability, leaving only the issue of damages to be decided at trial. As explained below, the Court agrees with Plaintiffs, and therefore the motion is GRANTED.

## BACKGROUND[1]

Plaintiffs are owners of the copyrights to some of the most popular sound recordings in the world. Plaintiffs are also members of the Recording Industry Association of America ("RIAA"), an organization which, among other things, is charged with combating the problem of counterfeit sound recordings in the United States. Hausman Decl. ¶ 2. Toward that end, the RIAA investigated the sale of counterfeit compact discs ("CDs") and caseated by vendors at the Marysville Flea Market.

Sinnott has been the sole owner of the MFM since 1992. The MFM operates every Sunday, weather permitting, and has the capacity to accommodate about 200 vendor booths, although there are generally some booths left empty. Sinnott Depo. at 51. Each vendor pays Sinnott a fee to

---

1. Unless otherwise indicated, the facts contained herein are not in dispute and are taken from the parties' Statement of Undisputed Facts.

rent a booth to sell merchandise to MFM customers. Sinnott provides security, utilities, restrooms, and a clean environment in which to sell merchandise to the approximately 1,500 customers that attend the flea market each week. Sinnott also operates concession stands at the MFM, and he is the only authorized seller of food or beverages on the premises. Sinnott recently opened and operates a go-kart track at the property.

Sinnott runs the day-to-day operations of the MFM, sets all rules and regulations, and is generally present during operating hours. Sinnott reserves the "right to inspect all merchandise, and also the right to refuse or cancel space rental." Sinnott Depo. Ex. 4. There are also rules restricting the types of merchandise that may be sold, such as prohibiting the sale of alcohol, and also food and drinks that can readily be consumed on the premises. The rules also add special requirements for vendors that sell produce. MFM employs security personnel that patrol the grounds and enforce these rules. MFM security personnel can, and have, ejected both customers and vendors for violating these rules.

On September 3, 2000, RIAA sent investigators to the MFM. There they found three vendors collectively offering approximately 3000 counterfeit CDs and cassettes for sale. The investigators went to the MFM office, and explained to Sinnott that several of his venders were selling CDs in violation of Plaintiffs' copyrights, and sought his assistance in putting a stop to these infringing sales. Ayala Decl. ¶¶ 7, 8; Sinnott Depo. at 120–24. They also offered to train MFM employees on simple methods of detecting pirated and counterfeit CDs and cassettes, and on ways to distinguish these from original recordings. In response, Sinnott "threw (the RIAA investigators) out of [his] office and told them not to come back on [his] property without [his] permission." Sinnott Depo. at 143–44 & Ex. 12. He did allow the investigators to deliver cease and desist letters to the vendors before leaving, however.

RIAA investigators visited the MFM at least six more times between September of 2000 and September of 2003, each time encountering vendors offering infringing CDs and cassettes for sale. Several of the vendors were quite candid in admitting that the CDs and cassettes they offered for sale were not original recordings. In all, a total of approximately 20,000 infringing CDs and cassettes were seen by RIAA investigators as being offered for sale during these visits, and investigators purchased 151 of these infringing CDs and cassettes.

Between September of 2000 and August of 2002, Charles Hausman, Anti–Piracy Counsel for RIAA, sent Sinnott four letters advising him of the infringing activity conducted by his vendors and explaining his potential liability. Each letter contained an offer to train MFM personnel on ways to detect and prevent the sale of counterfeit merchandise. Sinnott did not respond to any of these letters, and while acknowledging receipt, claims that he did not read them.

Plaintiffs, having failed to secure Sinnott's voluntary cooperation and assistance in preventing the infringing sales, filed this suit seeking to enforce their copyrights. Plaintiffs now move for summary judgment on the issue of Sinnott's contributory and vicarious liability for the MFM vendors' direct copyright infringement. This Court has been unable to find another federal court decision on any level that has decided a flea market owner's liability for a vendor's direct infringement.[2] As will be

---

**2.** The Ninth Circuit, in *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (1996), reversed a district court's order granting a motion to

explained, the Court does find Sinnott liable, and therefore Plaintiffs' Motion for Summary Judgment is GRANTED.[3]

## STANDARD

The Federal Rules of Civil Procedure provide for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Rule 56 also allows a court to grant summary adjudication on part of a claim or defense. *See* Fed.R.Civ.P. 56(a) ("A party seeking to recover upon a claim ... may ... move ... for a summary judgment in the party's favor upon all or any part thereof."); *see also Allstate Ins. Co. v. Madan,* 889 F.Supp. 374, 378–79 (C.D.Cal. 1995); *France Stone Co., Inc. v. Charter Township of Monroe,* 790 F.Supp. 707, 710 (E.D.Mich.1992).

The standard that applies to a motion for summary adjudication is the same as that which applies to a motion for summary judgment. *See* Fed.R.Civ.P. 56(a), 56(c); *Mora v. Chem–Tronics,* 16 F.Supp.2d 1192, 1200 (S.D.Cal.1998).

Under summary judgment practice, the moving party

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those por-

tions of 'the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. 2548(quoting Rule 56(c)).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

In attempting to establish the existence of this factual dispute, the opposing party must tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R.Civ.P. 56(e). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Owens v. Local No. 169, Assoc. of Western Pulp and Paper Workers,* 971 F.2d 347, 355 (9th Cir.1992). Stated another way, "before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there

---

dismiss, holding that a flea market owner *could be* held liable for contributory and vicarious infringement. No decision has been found answering the question on summary judgement or after trial, and therefore no decision has actually held such an owner liable.

**3.** Because oral argument would not have been of material assistance, the Court ordered this matter submitted on the briefs. E.D. Cal. Local Rule 78–230(h).

is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." *Anderson,* 477 U.S. at 251, 106 S.Ct. 2505 (quoting *Schuylkill and Dauphin Improvement Co. v. Munson,* 81 U.S. 442, 14 Wall. 442, 448, 20 L.Ed. 867 (1872)). As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more that simply show that there is some metaphysical doubt as to the material facts ... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 586–87, 106 S.Ct. 1348.

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines,* 602 F.Supp. 1224, 1244–45 (E.D.Cal.1985), *aff'd,* 810 F.2d 898 (9th Cir.1987).

### ANALYSIS

Plaintiffs, as owners of the copyrights at issue in this suit, enjoy the exclusive right to reproduce the copyrighted sound recordings in phonorecords, and to distribute the phonorecords to the public by sale.[4] 17 U.S.C. § 106; 17 U.S.C. § 114. Plain-

tiffs claim that these rights were infringed by MFM vendors, who were selling pirated or counterfeit copies of their copyrighted works.[5] Plaintiffs seek to hold Sinnott, as owner and operator of MFM, liable for the vendors' infringing activities.

Although the Copyright Act does not contain any provision imposing secondary liability for copyright infringement, "courts have long recognized that in certain circumstances, vicarious or contributory liability will be imposed." *Fonovisa, Inc. v. Cherry Auction, Inc.,* 76 F.3d 259, 261 (9th Cir.1996) (citing *Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417, 435, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984)).

### 1. Direct Copyright Infringement By MFM Vendors

■ Establishing direct copyright infringement by the MFM vendors is a prerequisite to both the contributory and vicarious copyright infringement claims. *A & M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1013 n. 2 (9th Cir.2001). It is uncontested that Plaintiffs are the holders and owners of the copyrights in the sound recordings at issue. It is also uncontested that various MFM vendors were selling unauthorized copies, either pirated or counterfeit, of Plaintiffs' copyrighted sound recordings. It is undisputed that by doing so, these vendors directly infringed Plaintiffs' copyrights in the sound recordings. Thus, the prerequisite of direct infringement is satisfied.

---

**4.** The Copyright Act defines "sound recordings" as "works that result from the fixation of a series of musical, spoken, or other sounds." 17 U.S.C. § 101. Thus, the copyright is limited to the sounds recorded on the disc, tape, or record, and does not include the compilation of words and musical notes that makes up the song. This is a separate copyright not at issue here.

**5.** "Pirated" compact discs or cassettes are those that duplicate the sound recordings without attempting to pass the copies off as originals. "Counterfeit" copies are those that also copy the packaging and artwork of the original compact disc or cassette in an attempt to pass the copies off as originals.

### 2. Contributory Copyright Infringement

■ The theory of contributory liability was applied to copyright infringement by the Second Circuit in *Gershwin Pub Corp. v. Columbia Artists Mgmt., Inc.,* 443 F.2d 1159 (2d Cir.1971). In the classic statement of the theory, " 'one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer.' " *Napster,* 239 F.3d at 1019 (quoting *Gershwin,* 443 F.2d at 1162).

### A. Knowledge of Direct Infringement

■ To hold Sinnott liable for contributory infringement, Plaintiffs must show that Sinnott " '[knew] or ha[d] reason to know' of direct infringement." *Napster,* 239 F.3d at 1020 (quoting *Cable/Home Communication Corp. v. Network Prods., Inc.,* 902 F.2d 829, 845 & 846 n. 29 (11th Cir.1990)). Sinnott strenuously argues that actual knowledge, rather than constructive knowledge, is required to hold him liable for contributory infringement. He further contends that he neither knew, nor had reason to know, of the direct infringing activities of his vendors.

Sinnott first contends that actual "knowledge of specific instances of infringement" are required to satisfy the "knowledge" prong of contributory liability. Opp'n, at 20. In making this argument, Sinnott relies on *Metro–Goldwyn–Mayer Studios, Inc. v. Grokster, Ltd.,* 259 F.Supp.2d 1029 (C.D.Cal.2003). But *Grokster* does not compel this finding in Sinnott's case. The question in *Grokster* was more about when the defendants had knowledge rather than what knowledge they possessed. For it is only if the defendant has knowledge of the direct infringement at the time it materially contributes to the direct infringement that secondary liability can be found.

In *Grokster,* the court found that the defendants were not liable because they only provided the software that allowed others to share music, but none of the actual sharing involved the defendants directly. 259 F.Supp.2d at 1039–40. Thus, the defendants claimed, and the court agreed, that they were much more like the VCR makers in *Sony* than Napster because the file sharing users of Napster relied on Napster for the connection between them. Grokster, however, provided the software and then the file sharing users communicated without Grokster's assistance, much like the VCR makers in *Sony* merely provided the VCR and the users did the rest.

In *Napster,* the Ninth Circuit held that Napster was much more like the swap meet (flea market) owner in *Fonovisa* than the VCR makers in *Sony.* 239 F.3d at 1021. The instant case concerns a flea market owner, just as in *Fonovisa.* Therefore, the analysis found in *Napster* and *Fonovisa,* not *Grokster,* is applicable here and controls this Court.

*Napster* clearly states that "[c]ontributory liability requires that the secondary infringer 'know or have reason to know' of direct infringement." 239 F.3d at 1020. The district court in *Napster* concluded that Napster had both actual and constructive knowledge, and the Ninth Circuit agreed. *Id.* (stating "[i]t is apparent from the record that Napster has knowledge, both actual and constructive, of direct infringement.")

Later in the opinion, in explaining why *Sony Corp. v. Universal City Studios, Inc.* did not shield Napster from liability, the Ninth Circuit states that "absent any specific information which identifies infringing activity, a computer system operator cannot be liable for contributory infringement

*merely because the structure of the system allows for the exchange of copyrighted material."* *Napster,* 239 F.3d at 1021 (emphasis added). Similarly in *Sony,* a manufacturer of a video cassette recorder could not be held liable for copyright infringement merely because the recorder could be used to make infringing copies. 464 U.S. at 442, 104 S.Ct. 774. This is equivalent to saying that a flea market owner cannot be held liable for contributory infringement merely because the structure of the flea market allows for the possibility that a vendor might sell infringing goods. However, this does not preclude the possibility that a flea market owner could be held to constructive knowledge of infringement based on the facts of the individual case.[6]

In fact, the Ninth Circuit found that Napster did have constructive knowledge of direct infringement. *Napster,* 239 F.3d at 1020. The court did not rely on this constructive knowledge to hold Napster liable for contributory infringement because they also found Napster had actual knowledge. *Id.* However, the decision does not state that constructive knowledge is insufficient to establish secondary liability.

In the present case, just as in *Napster,* it does not matter whether constructive knowledge is sufficient or whether actual knowledge is required. It is clear that Sinnott had both actual and constructive knowledge of the MFM vendors' direct infringement. Actual knowledge is established by Sinnott's admission that RIAA investigators personally told him of the infringement on September 3, 2000. Sinnott Depo. at 131. RIAA investigators Victor Ayala and Kris Buckner identified themselves to Sinnott, and explained that three MFM vendors were selling infring-

ing CDs or cassettes, requested his assistance in putting a stop to the infringing activity, explained Sinnott's potential liability, and offered to train Sinnott and his staff to recognize infringing sound recordings. Ayala Decl. ¶¶ 5–8. Sinnott refused to assist the investigators, and he called security to have them escorted outside. Sinnott did allow the investigators to deliver cease and desist letters to three vendors with his security guard present, but he refused to accept copies of those letters himself. Ayala Decl. ¶ 9.

Sinnott claims this is insufficient to establish actual knowledge because he did not know who or what RIAA was, and claims to have felt threatened by the investigators. What he does not claim, however, is that he did not receive and understand the message the investigators delivered. He admits he understood the investigators explained both the direct infringement being committed by his vendors and his possible personal liability for that infringement. The fact that he was not personally acquainted with the messenger does not mean that he can ignore the message and claim ignorance of its contents.

Further, Sinnott claims that he cannot be held to knowledge of the direct infringement because no law enforcement personnel came to MFM to confiscate infringing sound recordings or otherwise inform him that the vendors were, in fact, infringing Plaintiffs' copyrights. The fact that law enforcement did not seize any CDs or cassettes does not establish that Sinnott did not have notice of the infringing activity. Sinnott does not explain how a Sheriff's deputy is more qualified to point out examples of infringing recordings

6. Sinnott does not contend, and this Court does not find, that *Sony* is applicable here, or that *Sony* would shield Sinnott from liability.

than trained investigators representing the copyright holders themselves.

Finally, Sinnott claims he was not provided specific information regarding the identity of the infringing vendors or the specific CDs or cassettes which were being sold in violation of Plaintiffs' copyright. The RIAA investigators attempted to show Sinnott the actual infringing recordings in person, and asked his assistance in allowing the investigators to request the vendors voluntarily surrender the counterfeit CDs and cassettes. Ayala Decl. ¶ 7. Sinnott refused, claiming "it's not my problem." Ayala Decl. ¶ 8.

These arguments that Sinnott did not have actual knowledge are without merit. There was more than a "bare" or "unsupported" assertion of infringement here. Sinnott purposefully refused to witness the infringement, and chose not to act on the personal notification he received. This does not allow him to disavow knowledge of the infringement, however.

In addition, between September of 2000 and August of 2002, a time period starting shortly after Sinnott received personal notification of the direct infringement, the RIAA sent Sinnott four letters explaining his vendors' infringing activities. Hausman Decl. Exs. 1–4. These letters also explained Sinnott's potential personal liability for the vendors' direct infringement. Attached to one of these letters were copies of the cease and desist letters the investigators gave to the three MFM vendors on September 3, 2000. Each cease and desist letter contained the name and address of the vendor that was selling infringing material. Hausman Decl. Ex. 2. Sinnott acknowledges that he received these letters sent by the RIAA, but claims he did not read them. Sinnott Depo. at 119.

Sinnott cannot, however, disavow the knowledge he would have had by reading the letters merely because he chose not to read them. Sinnott was aware the RIAA was investigating copyright infringement by MFM vendors, and the RIAA had previously advised him he could be held liable for their infringing activities. This is analogous to the situation in *Erhard v. Commissioner,* 87 F.3d 273 (9th Cir.1996), in which the plaintiff received a deficiency notice from the Internal Revenue Service but refused to open it. The taxpayer had received similar notices for prior years, and was held to actual notice of the contents of this notice also. *Id.* at 275 ("Nor will we ... sanction willful blindness to the actions of the IRS—the least we can expect of taxpayers is that they open the mail they receive from the IRS.") Similarly, Sinnott was expected to open the letters he received from RIAA after RIAA investigators had personally explained his potential liability to him. Thus, Sinnott is held to actual knowledge of the information contained in the letters.

Sinnott also had constructive knowledge of the direct infringement at MFM. At least one MFM employee was aware that vendors were selling infringing material. When the RIAA investigators delivered the three cease and desist letters on September 3, 2000, an MFM employee accompanied the investigators and insisted on reading the letters himself prior to allowing Ayala to give the letter to the vendor. Ayala Decl. ¶ 9. Additionally, on other occasions when investigators visited MFM without disclosing their identity, MFM employees told investigators that Sinnott had received letters from RIAA regarding the counterfeit CDs being sold at MFM. Campos Depo. at 119.

Accordingly, the Court finds that Sinnott had knowledge of the direct infringement by MFM vendors. Therefore, Sinnott is liable for contributory infringement if he materially contributed to the direct infringement.

## B. Material Contribution to Direct Infringement

■ Operating a flea market or swap meet involves providing vendors with support services such as "the provision of space, utilities, parking, advertising, plumbing, and customers." *Fonovisa*, 76 F.3d at 264. This is all that is required to satisfy the requirement of material contribution necessary to establish contributory liability. *See id.* Just as in *Fonovisa*, MFM provided its vendors with all of the listed support services with knowledge that some of the vendors were selling directly infringing materials. Merely "providing the site and facilities for known infringing activities is sufficient to establish contributory liability."[7] *Id.* As explained above, Sinnott had knowledge of the vendors' infringing activity, yet continued to provide the site and facilities to allow the vendors to continue to sell counterfeit CDs and cassettes. The fact that these vendors were given no special benefit above and beyond non-infringing vendors does not allow Sinnott to escape liability. *Fonovisa* cannot be read to require such special treatment to establish material contribution.

Therefore, Sinnott, with knowledge of the vendors' infringing activity, materially contributed to the infringement. Accordingly, Plaintiffs have established Sinnott's liability for contributory infringement of Plaintiffs' copyrights.

## 3. Vicarious Copyright Infringement

■ Plaintiffs also move for summary adjudication of the issue of Sinnott's vicarious liability for copyright infringement. The theory of vicarious liability for copyright infringement "is an 'outgrowth' of respondeat superior." *Napster*, 239 F.3d at 1022. In applying this theory in the context of copyright infringement, "vicarious liability extends beyond an employer/employee relationship to cases in which a defendant 'has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities.'" *Id.* (quoting *Fonovisa*, 76 F.3d at 262). Thus, Plaintiffs must establish that Sinnott 1) had the right and ability to supervise or control the infringing vendors, and 2) obtained a financial benefit from the infringing vendors.

## A. Right and Ability to Control Direct Infringers

■ Plaintiffs contend that Sinnott had the right to control the MFM vendors by the rules and regulations he imposes over each vendor at MFM. These rules state that Sinnott "has the right to inspect all merchandise and also the right to refuse or cancel space rental." Sinnott Depo. Ex. 4. Additionally, the rules restrict or prohibit the sale of certain classes of goods, such as food, beverages, produce, and alcohol. Sinnott Depo. at 77 & Ex. 4. MFM security personnel are responsible for enforcing these rules, and if a vendor is found violating a rule—selling firearms or ammunition, for example—the vendor is asked to stop violating the rule. Sinnott Depo. at 79. Vendors that continue to violate a rule are ejected from the flea market. Sinnott Depo. at 79.

Sinnott seemingly concedes that he has the *right* to control his vendors based on these rules, but maintains that he does not have the *ability* to control his vendors. He contends that neither he nor his staff possess the training or knowledge required to distinguish counterfeit CDs and cas-

---

7. In this holding, the Ninth Circuit implicitly rejected the district court's view that contributory infringement requires that "the defendant expressly promote[ ] or encourage[ ] the sale of counterfeit products, or in some manner protect[ ] the identity of the infringers", a view relied upon by Sinnott. *Fonovisa*, 76 F.3d at 264 (internal quotation omitted).

settes from legitimate recordings. As will be shown, Sinnott's argument is so devoid of any merit that, quite frankly, it offends the Court.

First, when RIAA investigators met with Sinnott on September 3, 2000, they offered to train Sinnott and other MFM employees on detection of counterfeit CDs and cassettes at no cost to MFM.[8] Sinnott Depo. at 131. Second, four letters were sent by RIAA to Sinnott that repeated the offer of training. Hausman Decl. Exs. 1–4. Third, Sinnott was sent pamphlets describing the ways of detecting counterfeit recordings which gave color examples showing the differences. Hausman Decl. Ex. 3. For reasons known only to Sinnott, he refused the verbal offer of training, never responded to the written offers, and did not share the information in the pamphlet with his employees. Sinnott Depo. at 131, 133–35. Given all this, Sinnott cannot claim that a lack of training was the reason he was unable to control the vendors' sale of infringing materials.

Sinnott also argues that it would be too burdensome to require that he prevent the sale of infringing music. This, too, is unpersuasive. Sinnott has no trouble policing MFM for vendors selling food that would compete with his concession stand, or firearms, or any of the other classes of prohibited goods. Sinnott Depo. at 79, 86, 88, 91, 107. He has not shown that checking the few vendors that sell recorded music for counterfeit merchandise would be more burdensome than checking for other prohibited goods.

The Court finds that Sinnott does indeed have both the right and the ability to supervise and control the MFM vendors. If Sinnott derives a financial benefit from the direct infringement, he is vicariously liable for said infringement.

## B. Financial Benefit From Direct Infringement

■ Sinnott claims that he received no benefit from the infringing sales of CDs and cassettes, and therefore cannot be held vicariously liable. The Court disagrees. In *Fonovisa* the Ninth Circuit stated that "the sale of pirated recordings at the [flea market] is a 'draw' for customers, as was the performance of pirated music in the dance hall cases and their progeny." 76 F.3d at 263–64. The court found that as a result of this 'draw', the flea market received several benefits, including admission fees, increased revenue from concessions stands, and parking fees. *Id.* at 263. The court rejected a requirement that the financial benefit be tied directly to sales of infringing music by way of commission or otherwise. *Id.*

Here, Sinnott received the same benefit as did Cherry Auction in *Fonovisa.* The infringing music, sold at "bargain basement" prices, was a "draw" for MFM customers. While customers were not charged admission, that draw increased revenue at his concession stands selling food and beverages, over which Sinnott maintained a monopoly at MFM. Further, the draw increased revenue at Sin-

---

8. In his deposition, Sinnott testified as follows:

Q. Do you recall an offer to provide you with that kind of training?
A. Yes.
Q. And is it true that you refused that offer?
A. No.
Q Did you respond to the offer?
A. Yes.
Q. What did you say?

A. I asked them if they was [sic] going to pay me for training me.
Q. And what did they say.
A. No.
Q. And then what did you say?
A. Then I ain't [sic] doing it.
Sinnott Depo. at 131. Notwithstanding Sinnott's testimony to the contrary, the Court interprets this as a refusal of the RIAA's offer of training.

nott's go-kart track located on the same property. Sinnott Depo. Ex. 13. Finally, Plaintiffs submitted the expert opinion and report of Dr. Stephen Nowlis, which concludes that the sale of infringing music at MFM acted as a "substantial draw" for the flea market.[9]

The infringing vendors at MFM were a more significant draw that the infringers in other cases in which vicarious liability has been established. In *Polygram Int'l Publ'g, Inc. v. Nevada/TIG, Inc.*, 855 F.Supp. 1314 (D.Mass.1994), the court found that trade show organizers benefitted from exhibitors' infringement when four out of 2000 exhibitors played music in violation of the plaintiffs' copyrights. The music was played to attract attention to the exhibitor's booth, and the organizers, as well as the exhibitors, benefitted from the attention. *Id.* at 1333. Likewise in *Napster*, the court found a financial benefit merely because "the availability of infringing material 'acts as a draw for customers.'" 239 F.3d at 1023 (quoting *Fonovisa*, 76 F.3d at 263–64). Finally, a racetrack owner was found to have benefitted when the contractor it hired to entertain fans between races played copyrighted music without a license. *Famous Music Corp. v. Bay State Harness Horse Racing and Breeding Ass'n*, 554 F.2d 1213 (1st Cir. 1977).

Plaintiffs have established that Sinnott reaped a financial benefit from the direct infringement of the MFM vendors. Because he also had the right and ability to control said vendors, Plaintiffs have estab-lished that Sinnott is vicariously liable for the direct infringement of his vendors.

## CONCLUSION

For the reasons explained more fully above, Plaintiffs' Motion for Summary Judgment of Sinnott's liability is GRANTED. Plaintiffs' damages remain undecided.

IT IS SO ORDERED.

---

**9.** Defendants filed an objection to Dr. Knowlis' opinion and report, claiming that the expert opinion failed to meet the standard set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and are therefore inadmissible. The Court finds that the opinion and report meet the requirements of reliability set forth in *Daubert,* and are such that they would be helpful to a jury. Therefore, said opinion is admissible under Federal Rule of Evidence 702. Further, it is not necessary for the expert to quantify the draw; his characterization of the draw as "substantial" is sufficient to make his opinion relevant. Therefore, Sinnott's objection to Dr. Knowlis' opinion and report is overruled.